# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**JOHN TRUJILLO**,

    Plaintiff,

vs.                                                 No. **CIV 00-214 MCA/RLP**

**HELEN KISER**, **MARY NORDHAUS**,
**THE UNIVERSITY OF NEW MEXICO**,
and **ALBUQUERQUE PUBLIC SCHOOLS**,

    Defendants.

## MEMORANDUM OPINION AND ORDER
## GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

**THIS MATTER** comes before the Court on Defendant Nordhaus and University of New Mexico's Motion for Summary Judgment [Doc. No. 47] filed on April 30, 2001, and Defendant Kiser and Albuquerque Public Schools' Motion for Summary Judgment [Doc. No. 60] filed on July 9, 2001. Having considered the pleadings, memoranda, and exhibits of record, the relevant law, and otherwise being fully advised in the premises, the Court finds grounds for granting Defendants' motions as explained below.

**I.**     **BACKGROUND**

Plaintiff John Trujillo's Amended Complaint for Damages as a Result of Sexual Harassment alleges that while enrolled as a student-teacher in a graduate-level teacher certification program run by Defendant University of New Mexico (UNM) and Defendant

Albuquerque Public Schools (APS) during the 1997-1998 school year, he was given a grade of "no credit" because he did not acquiesce to requests for sexual favors by Defendant Helen Kiser, who was a site facilitator at one of the schools where Mr. Trujillo was student teaching. Defendant Mary Nordhaus was the coordinator of the teacher certification program. In that capacity, Dr. Nordhaus had responsibility for assigning Mr. Trujillo the grade of "no credit" after Ms. Kiser and others reported that he had performed poorly and not turned in some of his assignments for the course.

Mr. Trujillo alleges that Ms. Kiser's unwelcome sexual advances consisted of the following behavior. On the first occasion, he alleges that Ms. Kiser came up and rubbed her shoulder on him while he was seated at a table. Mr. Trujillo alleges that on a few other occasions Ms. Kiser asked to meet with him after the regular school day ended at 3:30 p.m., asked him to have dinner and/or go to a movie with her, and touched him in what he perceived to be a sexually suggestive way by placing her arm or hand on or near his back or shoulder and getting "really close." Mr. Trujillo claims he indicated to Ms. Kiser that these alleged sexual advances were unwelcome by moving away from her when she got near him and by informing her that he was already involved with someone else. According to Mr. Trujillo, these incidents occurred at the school where he was student teaching during November and December 1997. Ms. Kiser denies that any of these incidents occurred.

Mr. Trujillo alleges that after the third time he rejected Ms. Kiser's sexual advances, she stopped asking to go out with him and instead began retaliating against him by not giving him a good evaluation and claiming that he did not turn in his portfolio when it was due near

the end of the Spring 1998 semester. Mr. Trujillo's alleged failure to turn in his assignments, combined with other alleged instances of poor performance and failure to complete certain aspects of the program in a timely manner, eventually led Dr. Nordhaus to assign Mr. Trujillo a grade of "no credit" for the Spring 1998 semester. Both Ms. Kiser and Dr. Nordhaus deny any retaliatory motive for their actions.

At a meeting on May 7, 1998, Mr. Trujillo was informed that he had not successfully completed a "domain" of the teacher certification program entitled "Professional Responsibility." Also in attendance at that meeting were Ms. Kiser, Dr. Nordhaus, Karen Brugge (who was Plaintiff's "mentor teacher" in the program), and Peter Winograd (who was the director of UNM's Center for Teacher Education). The day after the meeting, Dr. Nordhaus and Dr. Winograd wrote a letter to Mr. Trujillo stating that "we agreed you would be free to leave the program on May 15" and that Mr. Trujillo was provided with the alternatives of either leaving the program and receiving a grade of "no credit" for student teaching, or continuing in the program under certain conditions and receiving a grade of "incomplete." The conditions that Mr. Trujillo allegedly had to satisfy in order to continue in the program included completion of all overdue course work, remaining at the school where he was student teaching until May 15, and completing an additional six-week period of student teaching during the summer or fall of 1998.

Mr. Trujillo alleges that he spoke with his mentor teacher, Ms. Brugge, on May 8, 1998, and that they agreed that day would be his last day at school. Ms. Brugge, however, was under the impression that Mr. Trujillo was to stay at the school until May 15, 1998.

After Mr. Trujillo did not appear at the school the following week (allegedly because he went to Disneyland with his girlfriend), Dr. Nordhaus concluded that he had elected not to complete the program and assigned him a grade of "no credit." Dr. Nordhaus informed Plaintiff of this decision in a letter dated May 15, 1998, and in a subsequent letter dated June 9, 1998.

Mr. Trujillo alleges that he informed Dr. Winograd about his allegations of sexual harassment as well as the related academic disputes on June 9, 1998. On July 19, 1998, Dr. Winograd wrote a memo to Mr. Trujillo stating that "[p]er our discussion, we will attempt to place you in a student teaching situation during the Fall Semester, 1998" and that "[d]uring this student teaching period you will be supervised by someone other than Mary Nordhaus and Helen Kiser." Mr. Trujillo filed a sexual harassment complaint with UNM's Office of Equal Opportunity (OEO) on July 21, 1998, per the procedure stated in the UNM student handbook. He did not continue his enrollment in the program, although there is no evidence that he was denied permission to enroll at any point.

Although Mr. Trujillo's complaint alleges that Dr. Nordhaus retaliated against him because he rejected Ms. Kiser's sexual advances, he has produced no admissible evidence that anyone told Dr. Nordhaus of his allegations of sexual harassment prior to the filing of his complaint with the OEO on July 19, 1998. Mr. Trujillo also has produced no admissible evidence that anyone told any supervisory officials within APS of his allegations of sexual harassment prior to the filing of his complaint.

Mr. Trujillo claims that APS had reason to know of the alleged sexual harassment by Ms. Kiser because he allegedly told his mentor teacher, Ms. Brugge, about some of his experiences with Ms. Kiser. The record is not clear, however, as to whether Mr. Trujillo specifically informed Ms. Brugge that he was sexually harassed by Ms. Kiser (as opposed to more generalized complaints of not getting along with her).

Mr. Trujillo filed a civil action against Ms. Kiser, Dr. Nordhaus, UNM, and APS on February 14, 2000. Mr. Trujillo's claims against UNM and APS are brought under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 (2000). His claims against Ms. Kiser and Dr. Nordhaus are brought under 42 U.S.C. § 1983 (1994). Mr. Trujillo asserts that Ms. Kiser and Dr. Nordhaus were state employees, who acted under color of law to deprive him of his federal constitutional right to substantive due process. He requests that damages be assessed against Defendants, along with attorney fees and costs. Defendants subsequently moved for summary judgment as to all of Mr. Trujillo's claims.

## II. ANALYSIS

### A. Standard of Review

Under Fed. R. Civ. P. 56(c), the Court may enter summary judgment when the motion papers, affidavits, and other evidence submitted by the parties show that no genuine issue exists as to any material fact, and that the moving party is entitled to judgment as a matter of law. A "genuine issue" exists where the evidence before the Court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving party as to that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986). A fact is "material" if it

might affect the outcome of the case. See id. at 248. Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The moving party initially must make a *prima facie* showing that summary judgment is appropriate under Fed. R. Civ. P. 56. If the moving party makes such a *prima facie* showing, then the burden of going forward shifts to the non-moving party, who must show by affidavit or otherwise that a genuine issue of material fact remains for the factfinder to resolve. See Celotex Corp., 477 U.S. at 323. If the moving party introduces new evidence in a reply brief or memoranda, the Court should not accept and consider the new evidence without first affording the non-moving party an opportunity to respond. See Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1163-65 (10th Cir. 1998). Accordingly, Mr. Trujillo was granted leave to file a surreply regarding Defendants' summary-judgment motions in this case.

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial). See Celotex Corp., 477 U.S. at 324. In addition, the Court may disregard an affidavit that contradicts the affiant's own sworn deposition testimony if the Court finds that such an affidavit constitutes an attempt to create a "sham fact issue[]." Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986); see also Darnell v. Target Stores, 16 F.3d 174, 177 (7th Cir. 1994) (concluding that parties

cannot create material issues of fact by submitting affidavits that contradict their own deposition testimony).

It is not the Court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment. Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor. See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

### B. Title IX Claims Against UNM and APS

With certain exceptions not relevant here, Title IX of the Education Amendments of 1972 provides that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Sexual harassment by a teacher against a student may fall under the statutory definition of being "subjected to discrimination" on the basis of sex and give rise to an implied private right of action for money damages against a school district or university. See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 280 (1998); Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 640-41 (1999).

A school district or university's liability in damages under Title IX is subject to the following limitations. First, such an institution may be liable "only for its own misconduct." Davis, 526 U.S. at 640. Agency principles do not provide a basis for determining an

educational institution's liability under Title IX. See Gebser, 524 U.S. at 285; accord Morse v. Regents of the Univ. of Colo., 154 F.3d 1125, 1128 (10th Cir. 1998). Further, except in cases that involve an official policy of the educational institution, "a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." Gebser. 524 U.S. at 290; see also Davis, 526 U.S. at 645 (limiting "a recipient's damages liability to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs"); Murrell v. School Dist. No. 1, Denver, Colo., 186 F.3d 1238, 1246 (10th Cir. 1999) (concluding that a school district is liable under Title IX "only where it has made a conscious decision to permit sex discrimination in its programs" and that liability is precluded "where the school district could not have remedied the harassment because it had no knowledge thereof or had no authority to respond to the harassment").

An official has the authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf when he or she is "invested by the school board with the duty to supervise the [harasser] and the power to take action that would end such abuse." Murrell, 186 F.3d at 1247 (internal quotations omitted). Determining which officials have such authority "is necessarily a fact-based inquiry" because "officials' roles vary among school districts." Id.

Such an official "fails adequately to respond" only when his or her response "amount[s] to deliberate indifference to discrimination." Gebser, 524 U.S. at 290. An official is deemed "'deliberately indifferent'" only when his or her "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Davis, 526 U.S. at 648. The fact that a school fails to fire or expel the alleged harasser based on the alleged victim's complaint does not necessarily amount to "deliberate indifference." Id.

The standard articulated by the Supreme Court in Gebser applies to both "hostile environment" claims and "*quid pro quo*" claims under Title IX. See Morse, 154 F.3d at 1127-28; Liu v. Striuli, 36 F. Supp. 2d 452, 465 (D.R.I. 1999). *Quid pro quo* harassment occurs "when some benefit or adverse action, such as change in salary at work or a grade in school, is made to depend on providing sexual favors to someone in authority." Wills v. Brown Univ., 184 F.3d 20, 25 (1st Cir. 1999). Proving this type of sexual harassment requires a showing that the request for sexual favors was "unwelcome" and was "based on sex," and that the adverse action resulting from the victim's refusal to grant the harasser's request was "tangible." See Jones v. Clinton, 974 F. Supp. 712, 722 (E.D. Ark. 1997).

"Hostile environment" harassment occurs "where the acts of sexual harassment are sufficiently severe to interfere with the workplace or school opportunities normally available to the worker or student." Wills, 184 F.3d at 25. Determining whether such a hostile environment is present requires a court to look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with work or school performance. See Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998). The harassing conduct must be "so severe, pervasive, and objectively offensive" as to "deprive the victims of access to the educational opportunities or benefits provided by the school." Davis, 526 U.S. at 650. In order to meet this standard, "a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher, 524 U.S. at 787.

Thus, not every instance of bothersome or inappropriate behavior with a sexual connotation is deemed to create a hostile environment. Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to a sexually objectionable environment for purposes of Title IX, and the standards developed by the Supreme Court for determining whether such an environment exists are not intended to become a "'general civility code'" encompassing the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing. Id. at 788; cf. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81-82 (1998) ("The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment.").

In this case, Mr. Trujillo alleges that Ms. Kiser asked him out and touched his back or shoulder on a few occasions during November and December 1997. These allegations are

insufficient to support a claim that Mr. Trujillo was subjected to sexual harassment in the form of a hostile environment under the standard articulated above. See Bowman v. Shawnee State Univ., 220 F.3d 456, 463-64 (6th Cir. 2000) (concluding that a "shoulder rubbing incident," an incident in which the alleged harasser grabbed the victim's buttocks at a Christmas party, and a couple of invitations to swim in the alleged harasser's pool did not amount to a "hostile environment").

Mr. Trujillo also alleges that Ms. Kiser retaliated against him by claiming he failed to turn in his assignments and not giving him a good evaluation. In addition, he alleges that Dr. Nordhaus assigned him a grade of "no credit" based on Ms. Kiser's prior retaliatory actions. While one may question whether Mr. Trujillo suffered any "tangible" adverse action inasmuch as he was not denied the opportunity to continue his enrollment in the teacher-certification program, see Jones, 974 F. Supp. at 722-23, 726-27, the Court assumes for purposes of analysis that his allegations fall within the general definition of *"quid pro quo"* harassment. Cf. Crandall v. N.Y. Coll. of Osteopathic Med., 87 F. Supp. 2d 304, 318 (S.D.N.Y. 2000) (concluding that a medical student's *quid pro quo* claim was sufficient to defeat a motion for summary judgment where a supervisor of her clinical studies allegedly "often put his arms around her," "made numerous sexual comments to her," and carried out an explicit threat to give her a poor evaluation in retaliation for declining his repeated invitations to have lunch).

Nevertheless, Defendants UNM and APS are entitled to summary judgment because Mr. Trujillo has failed to produce any admissible evidence that any UNM or APS officials

with the requisite authority to address the alleged discrimination and to institute corrective measures on behalf of these institutions had actual knowledge of the alleged discrimination and failed adequately to respond. See Gebser, 524 U.S. at 291; Murrell, 186 F.3d at 1246-47. Although Mr. Trujillo makes some ambiguous assertions in his affidavit that he notified his mentor teacher, Ms. Brugge, about his problems with Ms. Kiser, these assertions contradict his own sworn deposition testimony and are insufficient to prove at trial that Ms. Brugge had timely notice that such problems involved sexual harassment. See Darnell, 16 F.3d at 177 (concluding that parties cannot create material issues of fact with affidavits that contradict their own deposition testimony); Franks, 796 F.2d at 1237 (concluding that courts may disregard an affidavit that contradicts affiant's sworn testimony when such an affidavit constitutes an attempt to create a "sham fact issue"); cf. Gebser, 524 U.S. at 291 (concluding that a complaint regarding a teacher's use of inappropriate language in classroom discussions with students was insufficient to provide notice that the teacher was having sexual intercourse with another student outside of class).

Further, Mr. Trujillo has not presented evidence regarding the program's chain-of-command to support his contention that a "mentor teacher" in Ms. Brugge's position had the requisite supervisory authority over a "site facilitator" such as Ms. Kiser or the program coordinator, Dr. Nordhaus. See Murrell, 186 F.3d at 1247. Although Dr. Nordhaus, the program coordinator, might have had the requisite authority to rectify Ms. Kiser's alleged misconduct, there is no admissible evidence that Dr. Nordhaus had actual knowledge of Mr. Trujillo's allegations of sexual harassment until after she issued her letters to Mr. Trujillo

-12-

on May 15, 1998, and June 9, 1998, informing him that he would receive a grade of "no credit" for his student-teaching course. Before she had notice of these allegations, Mr. Trujillo was offered alternatives for completing the requirements of the program and avoiding the grade of "no credit." There is no evidence that any of these alternatives was conditioned on Mr. Trujillo's willingness to grant sexual favors to Ms. Kiser.

After Mr. Trujillo allegedly notified Dr. Winograd of his allegations of sexual harassment which implicated both Dr. Nordhaus and Ms. Kiser, Dr. Winograd's documented response was to offer Mr. Trujillo the opportunity to complete the program by performing an additional six weeks of student-teaching under the supervision of someone other than Dr. Nordhaus or Ms. Kiser. In addition, UNM's OEO responded in accordance with its established policy published in the student handbook by conducting an investigation of Mr. Trujillo's allegations of sexual harassment as soon as those allegations were reported. While these responses by Dr. Winograd and the OEO undoubtedly did not meet all of Mr. Trujillo's demands, Mr. Trujillo has submitted no evidence to show that they were "clearly unreasonable" or "'deliberately indifferent'" to the alleged harassment. Davis, 526 U.S. at 648; Gebser, 524 U.S. at 291. For these reasons, the Court concludes that Defendants UNM and APS are entitled to summary judgment as to Mr. Trujillo's claims against them under Title IX.

### C. Section 1983 Claims Against Ms. Kiser and Dr. Nordhaus

Section 1983 provides, in relevant part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state or territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. As with Title IX claims, there are significant limitations on a person's liability under Section 1983 in this context. Governmental entities and government officials in their official capacity are subject to suit under Section 1983 only if the challenged actions were taken pursuant to an established institutional policy or custom, or by an official with final policy-making authority. See Murrell, 186 F.3d at 1249-51. A supervisory official's liability for the actions of a third party or coworker under Section 1983 must be predicated upon that supervisory official's deliberate participation, or conscious acquiescence in the deprivation of constitutional rights; mere negligence in supervising the third party or coworker is not enough. See id. at 1250.

Further, persons sued in their individual capacity generally are entitled to qualified immunity "unless it is demonstrated that their alleged conduct violated clearly established constitutional rights of which a reasonable person in their positions would have known." Id. at 1251. "In order for the law to be clearly established, 'there must be a Supreme Court or other Tenth Circuit decision on point, or the clearly established weight of authority from other circuits must have found the law to be as the plaintiff maintains.'" Id. (quoting Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992)).

Although a Section 1983 action alleging sexual harassment "could not be predicated on a violation of Title IX itself[,]" Seamons v. Snow, 84 F.3d 1226, 1234 n.8 (10th Cir. 1996), Title IX does not preclude bringing such an action if it is predicated on a constitutional violation by someone acting under color of state law, see Gebser, 524 U.S. at 292; Murrell, 186 F.3d at 1251 n.8. Some forms of sexual harassment may be cognizable as constitutional violations under the Equal Protection Clause or the substantive due process component of the Fourteenth Amendment. See Murrell, 186 F.3d at 1251; Jones, 974 F. Supp. at 719-20. In this case, Mr. Trujillo's amended complaint does not allege a violation of the Equal Protection Clause. Thus, the Court limits its analysis to the issue of substantive due process. See Whitney v. State of N.M., 113 F.3d 1170, 1173-74 (10th Cir. 1997) (concluding that it is not the Court's function to "supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf").

There are two kinds of substantive due process violations that may involve sexual harassment. First, there are circumstances in which "hostile environment" harassment by a government official is so severe and intrusive as to violate a person's right to bodily integrity and privacy that is protected under the substantive component of the Due Process Clause. See Haberthur v. City of Raymore, Mo., 119 F.3d 720, 723-24 (8th Cir. 1997). Not all physical contact or sexual behavior by the harasser is sufficient to violate this substantive due process right, however. See, e.g., Reeve v. Oliver, 41 F.3d 381, 382-83 (8th Cir. 1994) (twice rubbing victim's back and staring at her chest did not state actionable substantive due process claim); Jones, 974 F. Supp. at 720, 725 (rejecting substantive due process claim

-15-

based on allegations that harasser attempted to kiss the victim, hugged her, placed his hand on her leg, and exposed himself).

In this case, Mr. Trujillo's allegations of sexually suggestive touching by Ms. Kiser are not sufficient to establish a viable substantive due process claim because the alleged touching was not so severe and intrusive as to violate his right to bodily integrity and privacy. See Reeve, 41 F.3d at 382-83; Jones, 974 F. Supp. at 720, 725. Moreover, there is no evidence that Dr. Nordhaus had actual knowledge of Ms. Kiser's alleged harassment and made a conscious decision to participate or acquiesce in such harassment. See Murrell, 186 F.3d at 1250.

In the alternative, Ms. Kiser is entitled to qualified immunity regarding this claim because there is no established law which would cause a reasonable person in her position to know that touching another person on the back or shoulder and asking him out to dinner or a movie violates his constitutional right to bodily integrity or privacy. See generally Murrell, 186 F.3d at 1251. Dr. Nordhaus also is entitled to qualified immunity regarding this claim because there is no established law which would cause a reasonable person in her position to know that she may be held liable for sexual harassment by a coworker or third party without any actual knowledge or deliberate participation in that harassment. See id.

A second kind of substantive due process claim that may be relevant under the circumstances alleged here involves arbitrary state action that deprives an individual of a constitutionally protected liberty or property interest. See Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 222-23 (1985). This type of substantive due process violation

arguably may encompass some forms of "*quid pro quo*" sexual harassment, inasmuch as the definition of "*quid pro quo*" harassment implies that the victim is deprived of his or her liberty or property for an arbitrary or capricious reason, namely gender discrimination. See Gossett v. State of Okla. ex rel. Bd. of Regents for Langston Univ., 245 F.3d 1172, 1182 (10th Cir. 2001).

An essential element of this type of substantive due process claim is a showing that a constitutionally protected liberty or property interest is at stake. In order to show that such an interest is at stake, a plaintiff "must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Board of Regents v. Roth, 408 U.S. 564, 577 (1972); accord Jones, 974 F. Supp. at 726. Further, "[r]ights of substantive due process are founded not upon state provisions but upon deeply rooted notions of fundamental personal interests derived from the Constitution." Mangels v. Pena, 789 F.2d 836, 839 (10th Cir. 1986) (citing Regents of the Univ. of Mich., 474 U.S at 229-30 (Powell, J., concurring)).

In some instances, courts have assumed or concluded without analysis that students are deprived of an interest protected by the substantive component of the Due Process Clause when they are denied enrollment in an educational program. See, e.g., Regents of the Univ. of Mich., 474 U.S. at 222-23; Gossett, 245 F.3d at 1181; Gaspar v. Bruton, 513 F.2d 843, 850 (10th Cir. 1975); Harris v. Blake, 798 F.2d 419, 422, 424 (10th Cir. 1986). In those cases, however, the students were given no alternative to ending their enrollment in the

program at issue.  See Regents of the Univ. of Mich., 474 U.S. at 216-17; Gaspar, 513 F.2d at 845; Gossett, 245 F.3d at 1176; Harris, 798 F.2d at 421.

Mr. Trujillo's case is distinguishable from Regents of the Univ. of Mich., Gaspar, Gossett, and Harris because he has not presented admissible evidence that he was denied the right to continue his enrollment in the teacher-certification program.  Inasmuch as Mr. Trujillo was not denied the right to continue his enrollment in the teacher-certification program, he has not shown that he was deprived of the type of interest that was afforded protection under the substantive component of the Due Process Clause in those cases.

While Mr. Trujillo claims that he turned in all his work and had permission from Ms. Brugge to leave the school after May 8, 1998, he has not submitted any statute, contract, document, or other authority establishing that he had any legitimate claim of entitlement to academic credit for his student teaching course based upon the work he performed prior to leaving for his vacation to Disneyland on that date.  Mr. Trujillo also has not identified any specific, tangible action by Ms. Kiser or Dr. Nordhaus that denied him the right to continue his enrollment in the teacher-certification program or complete its requirements at a later date.  The undisputed evidence shows that he was given alternatives for continuing his enrollment, receiving academic credit, and completing the teacher-certification program both before and after he reported his allegations of sexual harassment.  Under these circumstances, the need for "restrained judicial review" in interpreting the substantive component of the Due Process Clause, see Regents of the Univ. of Mich., 474 U.S. at 225, as well as the Court's "reluctance to trench on the prerogatives of state and local educational

institutions and [its] responsibility to safeguard their academic freedom," id. at 226, all counsel against permitting Mr. Trujillo's substantive due process claims to proceed to trial.

Even if the Court were to assume that Ms. Kiser deprived Mr. Trujillo of some constitutionally-protected interest in receiving a good evaluation based on his student teaching prior to his departure, it does not follow that Dr. Nordhaus is liable for such a deprivation because there is no evidence that she had any actual knowledge that the information supplied to her by Ms. Kiser during the relevant time period was incorrect or pretextual. See Murrell, 186 F.3d at 1250. Further, Dr. Nordhaus and Ms. Kiser are entitled to qualified immunity with regard to this type of substantive due process claim inasmuch as there is no established law which would reasonably cause them to know that requiring a student to complete additional work before receiving academic credit under these circumstances would violate the substantive component of the Due Process Clause. See id. For these reasons, the Court grants summary judgment as to Mr. Trujillo's substantive due process claims under Section 1983 against Ms. Kiser and Dr. Nordhaus.

## III. CONCLUSION

For the foregoing reasons, the Court concludes that Defendants are entitled to summary judgment as a matter of law because Mr. Trujillo has failed to make an adequate showing on one or more essential elements of each of his claims under Title IX and Section 1983.

**IT IS, THEREFORE, ORDERED** that Defendant Nordhaus and University of New Mexico's Motion for Summary Judgment [Doc. No. 47] filed on April 30, 2001, be and hereby is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant Kiser and Albuquerque Public Schools' Motion for Summary Judgment [Doc. No. 60] filed on July 9, 2001, be and hereby is **GRANTED**.

                                        **M. CHRISTINA ARMIJO**
                                        United States District Judge